The sixth case, number 221859, Rafael Ithier et al. versus Carlos Juan Aponte Cruz. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning, Attorney Jose Hernandez, my co-representative at the appellant. Chief Judge Byron, I have reserved three minutes for rebuttal. You may. Chief Judge Byron, Judge Juan Cruz, Carl Lawrence Cruz, a friend of mine. Thank you for your support. Appellant, Carlos Aponte was a member of the Salsa band in Gran Cordo for 51 years. Your dad did really well. He performed as lead singer in over 200 sound recordings for the band. Sometime after leaving the band, he made a formal request for recording arguments. Your Honor, we're pretty familiar with the facts of the case. If you just want to give us the legal argument. Yes, Your Honor. The statutory language of this report tells that the royalties for recording arguments belong to the band's owner, and our position is that they belong to the members of the band. There's a threshold issue where the argument you're now making to us was made below. Do you want to just address it? The threshold argument? There's a threshold argument as to whether the argument you're now making to us was, in fact, made below. It was the argument made below. It was exactly the argument made below. The statutory language, the legislative record, and industry practice all point unequivocally to the conclusion that recording arguments' worth is belonging to the band members. The relevance that the statutory language says refers to the recording artist performing on a sound recording. As a meeting point, I would refer to the Webster's Dictionary defines one of the definitions of artist is a singer performing. The American Heritage Dictionary defines it as one such as an actor or singer who works in the performing arts. Now, that linkage of the word artist to performing is found in the statute repeatedly, and the Copyright Act, under Section 101, provides a definition of the purpose of performing. It is to recite, to render, to play, to dance, or act. All of those activities are carried by natural persons. That is the purpose of a statute. Of Section 114, G2. Can I just ask you this one, so I understand this, just on the waiver claim. The magistrate judge says the parties do not dispute that Elron Convo is an artist. Correct. And he is an artist that is different from Aponte. And I guess I'm just having trouble with that, how to think about that particular sentence and the way it's put. Because I understand you to be saying Elron Convo is not an artist. Only the artists in Elron Convo can be artists under the statute. Well, Elron Convo is the featured artist. What does Elron Convo mean for purposes of the statute? And that means only the human beings who are in Elron Convo. Contracted members.  A non-human being can never be an artist under the statute. Correct, Your Honor. That's the, if you apply the plain meaning of the word artist, it has to be a human being. And so in that sense, if the district court, if the magistrate judge was of the view the parties do not dispute that Elron Convo is an artist, because she then says Elron Convo as such, the court deems that per the text of the statute, the band Elron Convo may be deemed, may be a featured artist. But she seemed to think the entity could be a featured artist. You can test, when she says that was not disputed that it could be, you say that it was disputed because your argument was it couldn't be, only the individual members of it could be. But the concept of Elron Convo as an artist is a reference to the members. What makes Elron Convo an artist is that it has members that perform sounds either by singing or by playing an instrument. Your argument is a band can of course be an artist, but it's a band because it's made up of people. And that's how it qualifies as a performance. But just to be clear, when it says featured artist, the purpose of the statute is someone gets a royalty payment. Yes. Right? And you're saying that is only a human being. So in a sense, it's kind of a misnomer to describe the band independent of the individual artist in the band as being the artist. Wait, the featured artist is just the band member. The featured artist here is Elron Convo. But what is Elron Convo? It's the artist performing on the sound recording. The artist or artists are human beings. Performers are human beings. They're not abstract paintings. That was the purpose of the statute, when it was presented to the Senate before Senator Orrin has said, finally singers, writers and leaders, et cetera, are going to get compensated. And if you look at how it provides the right to pie, this belongs here. 50% goes to the owner of the copyright over the sound recording. Mr. Gutierrez acknowledged that the band's owner he owns or owns those sound recordings. Those that he doesn't own is because he must have negotiated those sound recordings with the recorder. So he collects from that part of the pie. The other part of the pie is... In theory, you could have a copyright owner. Correct. You could have the members of the band. And then the members of the band could be incorporated and the band could be a company, which does not have the copyright. Well, okay. You see what I'm saying? I see where you're going. And that actually would help clarify this point, Your Honor. You have under the Copyright Act a concept that authorship rests initially on the author. That's Section 201. And then it has an exception for works made for hire, where it says that, when you're an employer-employee relationship, the author will be the employer if whatever they carry out is carried out within the scope of employment. Now, Section 114G2, and that's for purposes of who owns the copyright over the sound recording. Section 114G2 says just for digital transmissions, 50% of the royalties go to the owner of the copyright over the sound recording. The other 50%, it doesn't say it goes to the author. It says it goes to the recording artist performing on the sound recording. It's making a distinction. It's aiming... And then, I mean, to see practically what that would mean. If we had a situation the record company has the copyright, right? The band has members. The band incorporated. Okay? And let's just imagine this. And then the band, having incorporated, has contracts. And what we say is, we have five members in our band. We all work for this company, which is the name of our band. And because the lead singer's the best or has the most leverage, they get 80% of what we do and the other people get, split the other 20%. Let's say that's the internal contract. You're saying, notwithstanding that, the way this statute works is these royalties disregard that and go to the individual members. Correct? Yeah. I'm not the only one saying that. I mean, you're saying, they bring up the example of the Beatles, saying that the Beatles incorporated us out of the chorus. But for purposes of these royalties, it's Ringo, John, George, and Paul. Can I ask you a practical question? Because I understand your argument is, for these particular statutory royalties, contractual arrangements don't matter. They may matter for all sorts of other things, but not these statutes. That's making it like, if you read G1 and then you read G2, you see the difference there. Yes, absolutely. So my question for you is more of a practical one. How does sound exchange determine, you know, does it just give everybody, if the band has four members, sound exchange knows who the members are and it automatically splits it 25-25-25, then everybody else, it considers to be a background musician or vocalist. Just practically, how does it work? I don't know, but they do it. At the beginning, when the issue arose, they suggested that the parties submit to mediation to determine if that was true, but they filed for the contrary. No, I just mean in the general. I'm sorry if I wasn't clear. I mean in the general situation. So, you know, take The Beatles. Everybody knows who the members of The Beatles are. I think Eric, that was pretty good. No? Okay. I thought everybody knew. Take U2. Yvonne might get more, right? By sound exchange? Yeah. I would agree. If we also look at the differences between the featured artists and the non-featured artists, this becomes clearer still. There's no definition of non-featured artists in the statute.  Sound exchange, the American Federation of Musicians and ACTRA are saying yes. That refers to session musicians and to background vocals. So if we accept that definition, because that's what the industry says the definition is, and we apply it to this case, then we have the absurd result under the district court's ruling where a background singer hired for a one-day gig with a grand combo will forever be compensated whenever that sound recording is digitally transmitted. But Mr. Aponte, who was there for 51 years, who participated in over 200 sound recordings, would not see a penny. But the logic of it would be he, unlike the session person, has whatever deal he struck with the company that he's working for. We'll learn. Now, the session person also struck a deal with Mr. Aguirre. They are in the same situation. But this one will never see a penny for his 200 sound recordings, but that non-featured artist will always be compensated. We think that these are absurd results. Finally, we have to listen to sound exchange in the American Federation of Musicians and the American Federation of Radio Artists. They are saying, this is the way it has been done for 20 years. We have developed industry practices. And on that point, we have an amendment to this provision in the... The 2002 amendment. Yeah, and that amendment, I assume, occurs when this long history is well known to Congress in amending the statute. The amendment doesn't suggest that the way they're doing it is wrong, right? Well, the amendment in 2002, after the original statute was 1995, and they realized that the record company was not paying the artists, so they introduced sound exchange so that artists would get paid. And what was the record... Sound exchange has been paying the performers, not the record company. And what was the record between 1995 and 2002 as to what the practice was? Or is the practice that sound exchange engages only from 2002 on? Well, it's engaged first. Okay, but as I said, the reason was it wasn't working the way Congress wanted it to work. The record companies were getting over the artists that were supposed to give their share to the recording artists that they were not doing it. That's why sound exchange was brought in. I understand that, but in that prior... Up until 2002, when it wasn't working the way you said they wanted it to work post-2002, was there anything that would indicate what the understanding was from 1995 to 2002 as to what the featured artist was? The featured artist has to be an abstract entity or be the individuals... Well, there's no case law in this matter. But I think the understanding was that the artists were not being paid and therefore we need to bring this company. This company came in and it has been painted the way we are telling this court that it should be done. The actual performers on the sound recording, not the owners of that. And they say this is the way we've been doing it for 20 years. This is industry practice. Upholding the district court's decision would often... And there's no way to read the 2002 amendment to make sense unless you adopt the reading of the 1995 revision that you're saying we should adopt. Well, I think we have to read the 2000 amendment looking at how sound and change implemented that. But we're not construing that amendment, are we? Excuse me? We're not construing that amendment, are we? What we're construing, actually, is the performing art. But I take what you're saying is that given what happened in 2002, it wouldn't make sense unless you construe the provision we are construing the way we say it has to be construed. I'm saying that, Mr. Representative. They're fulfilling the purpose of the amendment. And for that reason, we ask this court to reverse the district court. Thank you. Thank you, Counsel. At this time, if Counsel for the Appellees would please introduce himself on the record. He has a 15-minute response. Good morning, Your Honors. My name is Roberto Suello de Valle. I am Counsel for Appellees. May we address the court? Yeah. Your Honor, I was listening to the arguments raised by the clients, and we have to start out from a point specifically. And that is the fact that under 114G2B, the only entity or person entitled to receive monies is the featured artist. And the featured artist, according to legislative intent, is the attraction who has prominence. It does not go into, I mean to say, a ratio dissidentity stating that only humans can perform music. It goes into a specific statement that requires that whatever, whomever is the principal artist or the artist with prominence is the one that is entitled to receiving that money. If we were to read that legislation the way they intend to read it, we would eviscerate all the possible groups that could file a requirement of payment through 114D2. And that would be just because of merely the circumstances, specifically the one in this case. In this case, we have Don Rafael Gutierrez, which founded El Campombo almost 62 years ago. And since that point on, he's been the owner of the group. He's taken every determination in the group. And everybody that has participated in that group... He's the owner of the group. It's an incorporated entity? Yeah, it is an incorporated entity. Suppose it wasn't. Suppose we had an unincorporated band. What would you say happens under the statute? He'd still be the owner. Because he's the one that takes... He'd still be the person that would determine who is in the band, who performs in the band, and who does what. Because him, in his personal capacity, would be the owner. But what does it mean to be the... I don't understand what it means to say he's the owner. The owner is the person who founded the group. The owner is the person who has been with the group. Take a band that's four people. They met in high school. They got paid. They never incorporated. There's just the four of them. Who gets paid under you? Under that view, four people would get paid. Why? Because those are the participants... So the entity is the featured artist, which is the band, not the four people. Correct. So who do you pay? They're not incorporated. There's no legal entity to pay. There's no owner of it. On your view, nobody gets paid? You pay the person who originated the group, because that person... The founder? The founder. Where does that come from? That comes from the fact that that's the person who chose each person and told each person that you're going to be a hired employee to play in my band. And the work for hire agreements permit that. But one reason I'm a little skeptical of your reading is that a lot of ambiguities arise under your view that when there is an owner and incorporated entity, you pay the incorporated entity for the owner. Then when there's not, you start having to figure out who must be the founder, the one who chose them. All these things are very uncertain. The statute doesn't give us any guidance on it. Whereas on the opposite view, it's very straightforward. Featured artist is always the person. They're a featured artist if they're a member of the featured entity, the band. Just like you would say in the case in which they didn't incorporate, just make that the default. And it seems very straightforward. Don't call these ambiguities. But it wouldn't be just, because you have only one person that has stayed in that group and has determined everything that has been done in that group for a period of 62 years. And that person in his own capacity is entitled to hire you. The issue, though, is we have to interpret the text of the statute. And the text of the statute talks about featured artist, not founder or owner or manager or selector of the members of the band. So can you explain how your interpretation is actually connected to the statutory text? Because in the situation of the unincorporated entity, say U2 is not incorporated and it's just U2, they're a featured artist. You're saying what? Who is SoundExchange supposed to pay there based on the statute? SoundExchange, according to legislative intent, is supposed to pay El Gran Combo, and El Gran Combo is Rafael Rivera. But I'm talking about U2 for the moment. So U2, a U2 song is played. Who is SoundExchange supposed to pay if there's no incorporated entity? That depends on the internal agreements between the band members. Where is that in the statute? It doesn't have to be in the statute. It's something that happens, and it's a right that every owner has to reach an agreement with each of the participants in the band. And we cannot go beyond that. We have to establish what is the relationship between the musicians that are part of the band... Where does the statute discuss contractual arrangements between the musicians? Where is that in the statute? The statute talks about that in 114 G1 A and B, where it gives the right to a sound recording owner the right to reach an agreement with the performer to pay him royalties out of the royalties that are going to come out from the master owner. And it gives the example that if an agreement is reached with the master owner and, say, the featured performer or the master owner and the non-featured performer, they're allowed to get monies from that. And if we use that analogy and place it over 114 G2 B, we have the same result. But they're different parts of the statute, and they have different texts, and we're supposed to follow the text of the portion of the statute that we're interpreting. Yeah, but we have the work-for-hire agreements that is also a constant in this business. We can't go and say CC&D v. Reed is not applicable in this case. In this case, Mr. Rafael Yquier is the owner of the group and has a contract and an employee manual signed with all the members of who constitute El Caracol, and the owner is himself alone. So these people have agreed not to receive any royalties because the main attraction and the person that is supposed to keep all those royalties is Rafael Yquier and more. It may be. It may be that there could be a case in which there was an agreement of some kind that could waive the statutory right. But you're not arguing, and there's nothing in the record to suggest that there is a contract that specifically says that they will not take their statutory royalties. It is. It says that the statement, the outcome test of statements in the court's decision states that they have reached a work-for-hire agreement. Yeah, but the work-for-hire agreement doesn't speak to their statutory royalties under this provision. Not specifically, right? Yeah. So in other words, even on your view, if it's unjust in this way, one solution would be they could write the contract among the band members with the owner to disclaim the statutory royalty. There would be a question, I guess, of whether that agreement can hold up in the face of the statute, but we don't even have that situation here. We don't have that situation here. We have a situation in which they've been receiving the royalties, and nobody has asked for those royalties when they were a part of the band. They only requested the royalties once they were outside that. So it's like recognition that they are acknowledging that the only person with a right to those royalties is Rafael Intier. In fact, I differ with what counsel or not has said before. I think that the usage and custom in the industry is completely different. If you look at SAG-AFTRA and the way they've designed their web inscription for these royalties, they specifically state in accordance with 114p2c that non-featured vocalists can get those royalties. They don't talk about a lead singer. They don't talk about background singers. They just said, if you are not the main attraction, you can request these royalties through sound exchange and if you become a member of SAG-AFTRA. In fact, some of the actual members of El Gran Combo are getting the royalties. They're getting the non-featured artist royalties like Jerry Rivas is. So it's not a fact that they're not going to get any royalties. It's the fact that they're not going to get any royalties as a featured artist. He's going to get his 2.5 royalties under 114d2b and d2c if he just proves that he was part of the group. The only thing is that he's not going to be the featured artist. The featured artist is the attraction, which is El Gran Combo, and the prominent artist and the people who go to the theaters and who go to the concerts to see. They go to see El Gran Combo. They don't go to see Charly Aponte. Another important fact here is that Charly Aponte filed for these royalties by a sound exchange arguing that he was part of the featured artist, not acknowledging that El Gran Combo was the featured artist. And he was part of that since he's 114th part of that. He's supposed to get the royalties to himself. He argued that being himself the lead singer, he was entitled to the featured artist royalty, and that's not a position that's backed up by the legislative history or the example given in the legislative history which spoke about Diana Ross and the Supremes versus Diana Ross by herself or the Supremes by themselves. But it doesn't really address when it says that whether the Supremes are the entity, the incorporated entity, versus the individual, each one of the Supremes. Yeah, it doesn't say that, but... Can I just ask you, is the only relief being requested here a preparatory judgment? That is correct. And the suit is you against Aponte? That is correct. Yeah, I'm lying. Was there... Is that how these cases usually arise as opposed to it being a suit against sound exchange? Well... Why exactly is it Aponte the opposing party? He can't decide whether to pay the statutory royalty. He has no control of that at all. So why is he the proper defendant? Yeah, because when he makes a claim to sound exchange to get paid, the sound exchange places those royalties under dispute, and nobody gets paid. So why isn't the right actor to be suing sound exchange rather than Aponte? They're suing because they're suing Gran Combo because Gran Combo is not going to relinquish part of those royalties to be given to Mr. Aponte. And there has to be an agreement between them in order for the royalties to be split among them. The other thing that we want to touch a point on is, Your Honor, that when Gran Combo originated, it was the idea of Rafael Miquel. All the other members of Gran Combo, as we touched earlier, became part of that group, and he has always been the leader of that group, and that group has changed from lead vocalist several times. In the present, Gran Combo is doing touring throughout all the United States, and they don't have any of the original singers anymore. They actually are singers that substituted Mr. Aponte, and they are now singing these songs to the rest of the world. So what I mean by that is I'm making the point that when I'm talking about Gran Combo being the main attraction, if they're not going to a theater, they're not going to a concert to go see Charlie Aponte. They're going there to go see El Gran Combo. It doesn't matter who's going to be singing the songs, because this group has instilled itself in the culture of the Hispanics to a point that it doesn't matter who's going to sing. What matters is the entity of Gran Combo, and what's going to happen is people confide already what the Gran Combo is, and they're going to listen to the music no matter who's the main singer or the lead singer. So the amount of songs there... I think they might be disappointed if it was the three of us singing. Probably, but the amount of songs, Your Honor, that Aponte sang in the group is not important. What is important is who is the main attraction, who is talked to in prominence, who is the people that they are going to see, and that's what the legislative intent had in mind when they created 114-D2D. It's not a matter of whether humans sing or not. And, of course, this is another thing I wanted to bring to your attention is what happens when Charly Aponte left the group of Gran Combo? When Charly Aponte left the group of Gran Combo, he was a separate artist, as you can see that he was in the lower court. And what he's going to do with his career, he's going to sing the 200 songs he was used to sing in that Gran Combo, and he's going to want people to follow him to sing them again. Does Etier have some money in that? Etier was the person who built up that character, who built up the fame in that lead singer, and now he's passing off after that. Thank you. Thank you, Counsel. Would Counsel for the Appellant please reintroduce himself on the record? He has a three-minute rebuttal. Saturnio Sergantes Margaro for Appellant. Very quickly, when Brother Counsel invokes G1 and states that over there the statute says that the featured and unfeatured artists will get compensated pursuant to the contract, to their contracts, they seem to be acknowledging that for G1 purposes, those terms are referring to the act of human beings. Now, what did Congress do with G2? It formed a different rule. It said 50% will go to the copyright owner, 45% to the featured artist, and 5% to the non-featured artist. Oh, but featured artists under G2 is not referring to act of human beings for G1. It is? That makes absolutely no sense. Also, when a journalist told my joke, I was going to say that, of course, if it matters to the lead singer Isabel, if they name me the lead singer, no one will show up. It's better that your joke is about you than us. Maybe some will show up out of curiosity, but not what would be expected. Also, though, I think the work for Harry or a principle where he says and Jim Jones and Byron are exactly correct. Whatever contract there is, it's an employer's manual from 2011. Carlos Abonder was there since 1973, but it has no permission of waiving these rights. The whole concept of work for Harry makes this abundantly clear. If, for ownership purposes of the copyright, the Copyright Act provided that in an employee-employer relationship, the employer is the author, but instead in 112G2 it speaks about the performing artist. It doesn't use the word author. I think Congress is showing the difference. Congress means to compensate the actual human beings who produced, who created those sounds that we were hearing. So we ask that this Court reverse this ruling.